## In re Anonymous No. 52 D.B. 77

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania

HENRY, *Board Member*, October 17, 1978—Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement (rules), the Disciplinary Board of the Supreme Court of Pennsylvania (board), submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## I. HISTORY OF PROCEEDINGS

On January 23, 1977, a petition for discipline was filed by the office of disciplinary counsel alleging that in two separate transactions, respondent paid a total of ($150,000) in bribes to officials of [  ] Borough, [  ], in order to obtain zoning changes and other favors with respect to the development of land in those communities in violation of numerous disciplinary rules. The matter was referred to hearing committee [  ]. A hearing was held on April 17,

1978, at which time respondent was represented by [  ], Esq. Petitioner's case consisted of the testimony of respondent before the State of [  ] Commission of Investigation and a [  ] grand jury. The testimony on [Respondent's] behalf was presented by [  ] Esq., counsel to the [  ] Commission of Investigation with respect to respondent's cooperation in that matter, several character witnesses, and [Respondent]. The office of disciplinary counsel, because of [Respondent's] cooperation with the [  ] authorities and in the instant matter, recommended that [Respondent] be suspended for two months, which, under the present rules of disciplinary enforcement, would result in an automatic reinstatement. The hearing committee recommended that respondent be suspended for six months, "so conditioned that reinstatement at the end of the six month period is either automatic or can be reasonably guaranteed." No exceptions were filed by the office of disciplinary counsel or respondent with respect to the report and the matter was referred to this board for review and recommendation.

## DISCUSSION

This board and your honorable court are favored with a very excellent report by the hearing committee which concisely and accurately describes the nature of the testimony, the acts of misconduct and the cooperation and contrition of [Respondent]. Since we cannot improve upon it, and it is idle to attempt to restate the same, it is incorporated herein by reference. The discussion that follows is, therefore, in addition to, and not in lieu of the report of the hearing committee. The findings of fact and conclusions of law as set forth in the hearing com-

mittee's report are supported by the evidence and adopted by this board as its own. For the reasons set forth below, however, this board is of the opinion that, notwithstanding [Respondent's] past and continuing cooperation in these proceedings and with the [ ] authorities, the magnitude of his misconduct was such that a longer period of suspension is required.

[Respondent] is a 60-year-old attorney practicing in [ ]. Respondent was graduated from [ ] University and its law school. He was admitted to the bar in [ ] and served in the United States Army during World War II. Following his discharge from the service, he returned to the practice of law and since 1949 has been associated with his brother-in-law, [ ], Esq. He has been engaged in the general practice of law but fully 40 percent of his time has been devoted to managing family investments. Prior to his involvement in the transactions which are the subject of the present charges, [Respondent] had extensive experience in real estate development throughout eastern Pennsylvania, Delaware and Puerto Rico, including the development of shopping centers, apartment complexes and recreational facilities.

In February of 1967, respondent's wife purchased a 60 acre tract of land in [ ] Borough, [ ], at auction as the sole bidder for the minimum bid of $40,000. The tract was sold by the borough and was subject to a clause that provided that ownership would revert to the borough in the event that the property was not developed for industrial purposes within one year. Pursuant to the plan that had been formulated prior to the acquisition of the tract, it was transferred by respondent's wife to a corporation owned by respondent and other members of his family as well as one of respondent's clients.

In 1968, respondent purchased another tract of land in [ ] Borough known as the "[ ] Tract" for a family corporation for $212,000. This tract was a run-down private recreational area that respondent hoped to develop into a residential apartment complex. His interest in this particular tract extended back to 1965. From that time until the actual conveyance, [Respondent] had an agreement of sale with the owner that was conditioned upon obtaining the necessary zoning changes for his proposed use. After a number of unsuccessful attempts to obtain these changes, [Respondent] nevertheless purchased the property, abandoning the condition of zoning approval. The hearing committee found that respondent did not suspect that he would be required to pay bribes in order to develop and dispose of these properties at a profit at the time he acquired them.

Shortly after the closing of the [ ] Tract transaction, respondent was advised by his associate [A], that the public officials in the borough demanded payments from respondent or his corporation as a condition of granting the required zoning change. Subsequently, respondent made three payments totaling $30,000 to the officials between 1968 and 1971. The record establishes that these bribes were paid only as the result of the demands of the officials and not as a result of any solicitation, suggestion or offer by [Respondent]. Subsequently, and in a similar manner, shares of stock in the corporation owning the industrial tract were given to two public officials in exchange for the extension of the deadline under the reverter clause and $90,000 was paid to them between 1972 and 1973, when [Respondent] determined that it was not feasible to develop the tract for industrial purposes and secured a zoning change for residential use.

In 1971, following the rezoning of the [  ] Tract, it was sold by respondent for $660,000. The industrial tract was subsequently sold for $910,000 following rezoning but was reacquired by respondent after the purchaser defaulted on the purchase money mortgage after $423,000, including interest, had been paid by the purchaser.

The State Commission of Investigation of [  ], a non-accusatory body, whose function was to seek out corruption and inefficiencies in government, hold hearings and make recommendations, commenced an investigation into political corruption in the [  ] County area. The commission developed information with respect to changes in land use in the borough area and then endeavored to subpoena the developers involved in an effort to determine whether or not anything improper transpired. Because the commission had no jurisdiction over [Respondent] as a resident of the Commonwealth of Pennsylvania, he was placed under surveillance and a subpoena was served upon him while travelling on the [  ] Turnpike. The subpoena directed [Respondent] to produce the books and records of the corporation that owned the industrial park. It was not a personal subpoena. [Respondent] secured counsel in [  ] and decided to cooperate with the authorities, notwithstanding the fact that it would have been difficult for the State of [  ] to secure jurisdiction over him personally or to develop any evidence without his cooperation that would make him susceptible to criminal charges. A grant of immunity from criminal prosecution was obtained and thereafter [Respondent] testified before the commission in executive session, at a public hearing, before an investigating grand jury, and at the trials of some of the officials. Respondent's cooperation in this regard is still continuing.

The undisputed testimony establishes that respondent paid cash bribes to public officials in [   ] totaling $120,000 and transferred shares of stock in his corporation to two officials for which they ultimately received payments totaling $30,000. As a result of these payments, he obtained changes in the zoning of his real estate holdings which enabled him to make a substantial personal profit.

The hearing committee concluded that respondent's conduct violated Disciplinary Rules 1-102(A)(3) (illegal conduct involving moral turpitude); 1-102(A)(4) (conduct involving dishonesty, fraud, deceit and misrepresentation); 1-102(A)(5) (conduct prejudicial to the administration of justice); and 1-102(A)(6) (conduct adversely reflecting upon fitness to practice law) with respect to both transactions, and Rules 7-102(A)(3) (failing to disclose that which he is required by law to reveal); 7-102(A)(7) (counseling and assisting client in conduct that he knew to be illegal); and 7-102(A)(8) (engaging in other illegal conduct or conduct contrary to a disciplinary rule), with respect to the charges concerning the industrial tract since a client was involved in this transaction but not in the other transaction.

This board accepts the findings by the hearing committee that [Respondent] did not expect to have to participate in any bribery scheme at the time he acquired the properties and that the subject of the bribe was introduced by the public officials involved in the first instance and was not initiated as the result of [Respondent's] solicitation or suggestion. However, the board does note that once the bribery route was proposed, respondent became very intimately involved in the same, carefully camouflaging the source of the funds and being irritated only at the nuisance of having to convert

large sums of money into bills of small denominations, witnessing the precautions taken by Mr. [A], sealing the envelopes containing money in a particular way, observing the clandestine placing of the envelope containing the money in the trunk of a borough official's car and, developing the plan to disguise the payments to the public officials for their shares of stock in the corporation owning the industrial tract. The record also establishes that, while the bulk of the payment was in the form of a purchase money mortgage which might result in a default rather than payment in full, respondent sold the [   ] Tract following rezoning for an amount sufficient to recoup his investment in that tract and the industrial development tract but, nevertheless, continued to make payments with respect to the industrial tract over the next few years. While the board does not feel that [Respondent] entered into these transactions with the [   ] officials with enthusiasm, the record does establish that, once involved in the scheme, he did not make any substantial effort to limit the extent of his participation and accepted the payment of money and other things of value to the officials as a necessary cost of doing business in [   ] County, [   ]. Furthermore, as noted by the hearing committee at page 17 of their report, the only duress that [Respondent] was under was financial in nature and there was no suggestion of any threat of physical danger or mental coercion.

It is difficult to conceive of any act more damaging to our form of government than to secure political favors by bribery. The seriousness of the matter is compounded when these practices are engaged in by an attorney who has sworn to uphold the law and whose very livelihood depends upon the rule of law. Furthermore, [Respondent] engaged in these

activities as a fiduciary entrusted with other investors funds, and, in the case of the industrial tract, with a client's funds. When a member of the legal profession engages in bribery, public respect for our form of government, legal system and profession is irretrievably diminished. To his credit, [Respondent] belatedly recognized his obligations and has cooperated with the authorities to a much greater extent than might have been dictated by his predicament. He has admirably made available his intelligence, background and training to expose the wrongdoing in [   ] Borough and secure the convictions of some of the participants.

Throughout these proceedings, [Respondent] and his counsel have stressed that his involvement in this sordid affair was as an individual and not as a lawyer, implying that the Code of Professional Responsibility does not extend to private as opposed to professional conduct by attorneys or, at the very least, that an attorney is not held to as high a standard with regard to his private activities. Judge Digges, of the Court of Appeals of Maryland, in a prominent decision, stated: "The professional ethical obligations of an attorney, as long as he remains a member of the bar, are not affected by a decision to pursue his livelihood by practicing law, entering the business world, becoming a public servant, or embarking upon any other endeavor. If a lawyer elects to become a business man, he brings to his merchantry the professional requirements of honesty, uprightness and fair dealing." Maryland State Bar Association, Inc. v. Agnew, 318 A. 2d 811, at 815 (1974). When an individual accepts the privileges of becoming a member of the legal profession, he, of necessity, accepts the responsibility for the high standard of conduct that the public has

a right to expect. These ethical standards apply to all phases of his life and not merely to those activities directly related to the practice of his profession.

The hearing committee recommended that respondent be suspended for a period of six months. In arriving at this decision, the committee took into consideration respondent's previous unblemished record over a lengthy professional career and his extraordinary cooperation with [  ] authorities as well as the fact that respondent waived substantial defenses in the instant proceeding (most particularly with regard to the fact that the only testimony against respondent was his own testimony in other proceedings and a corpus delecti in Pennsylvania had not been, and probably could not have been, established). In the opinion of this board, in the absence of the mitigating circumstances considered by the hearing committee, it is very likely that our recommendation would have been disbarment. Under these circumstances, the board is of the unanimous opinion that a three year suspension adequately takes into account the favorable aspects of [Respondent's] past and present conduct.

## III. RECOMMENDATION

For the reasons set forth above, the disciplinary board recommends to your honorable court that respondent, [  ], be suspended for a period of three years with the right to apply for reinstatement pursuant to Rule 218 of the Pennsylvania Rules of Disciplinary Enforcement after two years and six months and that respondent shall comply with all of the provisions of Rule 217 of the Pennsylvania

Rules of Disciplinary Enforcement and sections 91.91-97 of the Rules of the Disciplinary Board.

Messrs. Reath and Schiavo did not participate in the adjudication.

## ORDER

EAGEN, *C.J.*, And now, January 16, 1979, the recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated October 17, 1978, is rejected; and it is ordered, that the said [Respondent], be, and he is herewith suspended for a period of six months from the bar of this court and in all courts under its supervisory jurisdiction until further order of the Supreme Court.

Mr. Chief Justice Eagen and Mr. Justice Nix would accept the recommendation of the Disciplinary Board and would impose suspension of three years.